UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

BAILEE H.,

      Plaintiff,

    v.                                      Civil Action 2:25-cv-407
                                           Magistrate Judge Chelsey M. Vascura

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## OPINION AND ORDER

Plaintiff, Bailee H. ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB"). This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 15), Plaintiffs Reply (ECF No. 16), and the administrative record (ECF No. 6). For the reasons that follow, the Commissioner's non-disability determination is **REVERSED**, and this matter is **REMANDED** to the Commissioner and the ALJ pursuant to Sentence Four of § 405(g).

## I.     BACKGROUND

Plaintiff filed her DIB application in November 2022, alleging disability beginning November 11, 2022. (R. at 179–85.) After that application was denied initially and upon reconsideration, an Administrative Law Judge ("ALJ") conducted a telephonic hearing on January 5, 2024, at which Plaintiff, who was represented by counsel, appeared and testified. (*Id.*

at 38–71.) On February 8, 2024, the ALJ issued an unfavorable determination, which became final on February 14, 2025, when the Appeals Council denied Plaintiff's request for review. (*Id.* at 14–37, 1–6.)

Plaintiff seeks judicial review of that unfavorable determination. She contends that the ALJ erred when he assessed Plaintiff's subjective symptoms. (Pl.'s Statement of Errors 12–17, ECF No. 11.) The Court agrees.[1]

## II.     THE ALJ'S DECISION

The ALJ issued the unfavorable determination on February 8, 2024. (R. at 14–37.) The ALJ initially determined that Plaintiff met the insured status requirements of the Social Security

---

[1] Plaintiff also contends that the ALJ erred when assessing Plaintiff's migraines at step two; evaluating medical opinion evidence; and relying on the VE's response to a hypothetical that did not accurately reflect her functional limits. (Pl.'s Statement of Errors 7–12, 17–18, ECF No. 11.) Because the Court finds that the ALJ erred when performing a subjective symptom assessment, it does not reach these additional contentions of error. The ALJ may, however, consider them on remand if appropriate.

2

Act through December 31, 2027. (R. at 19.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of November 11, 2022. (*Id.*) At step two, the ALJ found that Plaintiff had the following severe MDIs: status post VP shunt placement and open reduction and internal fixation (ORIF) surgery of the cervical spine; cervical and lumbar spine degenerative disc disease; anxiety; and depression. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 13.)

The ALJ then set forth Plaintiff's residual functional capacity ("RFC")[3] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20

---

[2] Social Security regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Does the claimant's severe impairment, alone or in combination with other impairments, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations" "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(a)(1), (b)–(c); 416.945(a)(1), (b)–(c).

CFR 404.1567(b) except: she can frequently push/pull with the left upper and lower extremities; she can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs; she can frequently balance (as defined in SCO) and crouch; she can occasionally crawl; she can occasionally reach overhead with the bilateral upper extremities; she can frequently handle, finger, and feel with the left upper extremity; she is limited to working in an environment with no more than moderate noise levels (as defined in the SCO); she cannot have exposure to unprotected heights or moving mechanical parts; she cannot engage in commercial driving; she can understand, remember, carry out simple tasks; she cannot perform work that requires satisfaction of production quotas or that involves assembly-line pace; she can have occasional interaction with co-workers and supervisors but no interaction with gen public; she can tolerate occasional changes in a routine work setting that are explained in advance.

(*Id*. at 22.) At step four, the ALJ relied on the VE's testimony to determine that Plaintiff could not perform her past relevant work. (*Id*. at 31.) At step five, the ALJ again relied on the VE's testimony and determined that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform, including the representative jobs of merchandise marker, routing clerk, and mail clerk. (*Id*. at 32.) The ALJ therefore determined that Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time frame. (*Id*. at 32–33.)

## III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm a decision by the Commissioner as long as it is supported by substantial evidence and was made pursuant to proper legal standards." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) (cleaned up); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Although this standard "requires more than a mere scintilla of evidence, substantial evidence means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 561 (6th Cir. 2022) (cleaned up) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)).

4

Though the substantial evidence standard is deferential, it is not trivial. The Court must "examine[ ] the record as a whole and take[ ] into account whatever in the record fairly detracts from the weight" of the Commissioner's decision. *Golden Living Ctr.-Frankfort v. Sec'y of Health & Hum. Serv.*, 656 F.3d 421, 425 (6th Cir. 2011) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, where "substantial evidence supports the Secretary's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020) (quoting *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## IV.    ANALYSIS

As explained above, Plaintiff contends that the ALJ committed reversible error when assessing her subjective symptoms. (Pl.'s Statement of Errors 12–17, ECF No. 11.) This contention has merit.

### A.    Relevant Standards

When a claimant alleges disabling symptoms, an ALJ must follow a two-step process to evaluate them. *See* 20 C.F.R. §§ 404.1529, 416.929; *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017). First, an ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must . . . evaluate the intensity and persistence of [the claimant's] symptoms

5

so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," an ALJ must consider all available evidence from medical and nonmedical sources, including medical opinions. *Id.* In addition, SSR 16-3p[4] sets forth factors that an ALJ will consider: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. 2017 WL 5180304, at *7–8; *see also* 20 C.F.R. § 404.1529(c)(3)(i)–(vii). Although an ALJ is not required to analyze all these factors, the ALJ should show that he considered the relevant evidence. *Roach v. Comm'r of Soc. Sec.*, No. 1:20-CV-01853-JDG, 2021 WL 4553128, at *10–11 (N.D. Ohio Oct. 5, 2021).

---

[4] SSR 96-7p, 1996 WL 374186 (July 2, 1996), which has been superseded by SSR 16-3p, required an ALJ to evaluate the overall credibility of a plaintiff's statements. In contrast, SSR 16-3p requires an ALJ to evaluate the *consistency* of a plaintiff's statements, without reaching the question of overall *credibility*, or character for truthfulness. 2017 WL 5180304, at *11 ("In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."). The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character." *Dooley v. Comm'r of Soc. Sec.,* 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (quoting SSR 16-3p). Therefore, the credibility determination and subjective symptom analysis are not materially different, and case law regarding the former applies with equal force to the latter.

Of note, an ALJ will consider whether a plaintiff sought medical treatment and followed prescribed care. SSR 16-3p, 2017 WL 5180304, at *9. Attempts to obtain or follow prescribed treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent. *Id.* at *9–10. But an ALJ may draw an adverse inference from a plaintiff's failure to seek or follow treatment only if he both considers and explains the plaintiff's possible reasons for that failure. *Id*. at *10; *Dooley,* 656 F. App'x at 119 (noting that an ALJ must consider the claimant's reasons before inferring that a lack of treatment undermines the claim).

An ALJ need only discuss those factors that are pertinent based upon the evidence in the record. SSR 16-3p, 2017 WL 5180304 at, *7–8. However, the ALJ's discussion of the applicable factors "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10; *cf. Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

## B.      Treatment History and Use of Medications

Here, the ALJ determined that Plaintiff's migraines were not as disabling as alleged, in part, because of her treatment history. (R. at 26.) The ALJ wrote as follows:

> Regarding the claimant's headaches, the record does not support the degree of frequency and severity alleged by the claimant. She reports a history of daily headaches ranging to current frequency of 8 migraines per month that can last several days at a time. However, it does not appear that the claimant was following with neurology or taking medication for a number of years (Exs. 4F/14, 8F). Neurology records show approximately a five-year gap in treatment (Exs. 8F, 13F). She also did seem to be prescribed any medication until approximately June of 2022 (Exs. 4F/14, 8F, 12F/103-146). Her medications were temporarily stopped due to pregnancy, but there is no evidence the claimant sought emergent treatment during that time or at any point after the birth of her child. If the symptoms were as

> debilitating as described, one would expect to see debilitating severity alleged, one would expect that some type of care would be sought. Nonetheless, that the claimant's treating provider indicated the claimant had at most moderate limitations prior to restarting medication in November 2023 is not consistent with disabling symptom levels (Ex. 13F). Moreover, the claimant has since indicated that Nurtec is helpful for her symptoms (Hearing Testimony).

(*Id.*)

As this discussion demonstrates, the ALJ determined that Plaintiff's migraines were not as disabling as alleged because she had an approximately five-year gap in treatment for her migraines. (*Id.*) Substantial evidence does not support that explanation, however, because any meaningful gap in treatment appears to have occurred before Plaintiff's alleged disability onset date.

The record reflects that Plaintiff was in a motor vehicle accident as a child in 2003 that caused occipitocervical disassociation— a disruption of the ligaments that connected the base of her skull to her cervical spine. (*Id.* at 353.) She consequently underwent cervical fusion from her occiput to her C4. (*Id.*) As a result of the accident, Plaintiff also required a VP shunt for posttraumatic hydrocephalus. (*Id.*)

In 2017, Plaintiff sought treatment for migraines that she reportedly had been experiencing for five years. (*Id.* at 693–96.) She apparently did not again seek neurological care until November 11, 2022, when she was evaluated by a neurosurgeon. (*Id.* at 353.) Significantly, however, November 11, 2022, is Plaintiff's alleged disability onset date.

At an appointment on her alleged disability onset date, Plaintiff reported progressively worsening neck pain over the preceding year and migraines occurring almost every other day. (*Id.*) She explained that her migraines originated behind her left ear, where her shunt tubing was located, and were accompanied by blurry vision and tingling in her arms. (*Id.*) An examination found that a sixth cranial nerve palsy prevented Plaintiff from turning her left eye outward. (*Id.* at

8

355.) Plaintiff's neurosurgeon ordered imaging to evaluate Plaintiff's cervical hardware and shunt and referred her to another neurologist for the migraines. (*Id*. at 356.)

In April 2023, Plaintiff saw a migraine specialist. (*Id*. 417–420.) After giving birth in August 2023, she returned to that provider for follow-up in October 2023. (*Id*. at 686–88.) Thus, the "five-year gap" in treatment identified by the ALJ appears span the period between Plaintiff's 2017 treatment and her alleged November 11, 2022 disability onset date.[5] Because that gap predates the period during which Plaintiff claims she became disabled, it provides only limited support for discounting her allegations during the relevant period.

The ALJ also discounted the disabling nature of Plaintiff's migraine symptoms because she was not prescribed migraine treatment until June 2022. (*Id.* at 26.) That reasoning is likewise problematic. Plaintiff did not allege disability until November 11, 2022, making any lack of treatment before that date of limited relevance. Moreover, the record indicates that the ALJ was mistaken. The record reflects that by 2017, Plaintiff had already tried and failed multiple medications including Topamax, Elavil, Imitrex, and Maxalt. (*Id.* at 696.)

The ALJ further relied on Plaintiff's failure to seek emergency treatment for her migraines during her pregnancy. (*Id*. at 26.) The record, however, provides a significant explanation. When Plaintiff saw a neurologist in April 2023, she was five months pregnant. (*Id*. at 417–420.) At that appointment, Plaintiff's provider informed her that "since she [was] currently five months pregnant, there are really no good medications that are safe for treating migraine headaches . . . ." (*Id*. at 420.) Thus, it appears that Plaintiff was warned against treatment, emergent or otherwise, during her pregnancy. Although an ALJ may draw an adverse

---

[5] Plaintiff also reported that she saw a neurologist in 2019. (*Id*. at 353.) It is, therefore, unclear if just how long any gap may have been. Either way, any gap occurred prior to Plaintiff's alleged disability onset date.

inference from a failure to pursue treatment, he can only do so before considering and explaining possible reasons for that failure. *Dooley,* 656 F. App'x at 119. It is unclear that the ALJ did so here.

Similarly, the ALJ discounted Plaintiff's allegations of disabling symptoms because she did not seek emergency treatment for her migraines after the birth of her child in August 2023. (*Id*. at 26.) But the record reflects that in October 2023, two months after the birth of her child, Plaintiff sought migraine treatment and was prescribed Nurtec as an abortive migraine medication. (*Id*. at 688.). Plaintiff did not, however, take other medications at that time because she was breastfeeding. (*Id*. at 688, 61.) Again, the ALJ did not meaningfully address this consideration before relying on Plaintiff's treatment history to discount her symptoms.

Moreover, the record reflects that Plaintiff had already exhausted numerous treatment options by the time she gave birth. By 2017, Plaintiff had already unsuccessfully tried Topamax, Elavil, Imitrex, and Maxalt. (*Id.* at 696.) By October 2023, she had also tried and failed numerous preventive medications including Zanaflex, Wellbutrin, birth control, Keppra, Celexa, Prozac, Paxil, Prozac, and riboflavin. (*Id*. at 686.) By that time she had also tried and failed numerous abortive medications including Fioricet, promethazine, sumatriptan, rizatriptan, Ubreivy, over the counter non-steroidal anti-inflammatories (Excedrin, Aleve, Ibuprofen), and acetaminophen. (*Id*.) Plaintiff was also unable to take propranolol/verapamil due to a history of hypotension. (*Id*.)

Given Plaintiff's extensive history of unsuccessful medication trials, her providers concluded that Botox injections represented her best treatment option. (*Id*. at 420.) They further explained, however, that Botox injections should be delayed until at least a few months after she delivered her child to allow for adequate recovery. (*Id*.) Consistent with that advice, Plaintiff

10

testified at the January 2024 hearing that she was scheduled to begin Botox injections the following month–approximately six months after she had given birth. (*Id*. at 61.)

Finally, the ALJ explained that he discounted Plaintiff's symptoms because Plaintiff testified that Nurtec helped her migraine symptoms. (*Id*. at 26.) And to be sure, Plaintiff stated that Nurtec would calm her migraines for approximately twenty-four hours and that it helped. (*Id*. at 58.) But she also testified that, despite taking Nurtec, she experienced three to four migraines a week accompanied by visual disturbances and dizziness. (*Id*.) She further testified that in addition to her migraines, she had daily headaches and neck pain. (*Id*.)

In short, the ALJ relied on Plaintiff's treatment history to discount the severity of her migraines but the purported "treatment gap" predated Plaintiff's alleged disability onset date. The ALJ also misstated Plaintiff's medication history and relied on isolated evidence of treatment effectiveness. Moreover, the ALJ failed to adequately consider record evidence explaining Plaintiff's treatment history during the relevant period, including her pregnancy and breastfeeding, before drawing adverse inferences. Accordingly, substantial evidence does not support the ALJ's evaluation of Plaintiff's subjective symptoms.

## C. Daily Activities

The ALJ also determined that Plaintiff's migraines were not as disabling as alleged, in part, because of her daily activities. (R. at 27.) The ALJ wrote as follows:

> Consideration has been given to the claimant's daily activities. The record shows that the claimant engages in numerous activities and tasks that are not consistent with disabling mental and physical limitation. She testified that she cares for her active 5-month-old child alone for most days, which requires significant focus and concentration to maintain her safety and overall well-being. The claimant testified to driving without difficulty, an activity which similarly requires sustained focus, pushing foot controls, and gripping a steering wheel, for example. In addition to caring for her infant, the claimant continues to provide all manner of care for her other two children with less assistance from family (Hearing Testimony). The claimant testified that her husband and sister help once or twice per week; the sister

11

> no longer lives with the claimant's family (Ex. 3E, Hearing Testimony). Consistent with the ability to perform light work, the claimant helps with cooking, cleaning, doing laundry, and shopping for groceries (Exs. 3E, 7F, Hearing Testimony). Taken in isolation, these activities may not equate to the ability to sustain full-time work; however, when considered with the overall record, they suggest that the claimant retains greater mental and physical capacities than alleged.

(*Id.*)

As this discussion demonstrates, the ALJ discounted Plaintiff's symptoms because Plaintiff cared "for her active 5-month-old child alone for most days" and provided "all manner of care" for her other children with "less assistance," drove without difficulty, and helped with cooking, cleaning, laundry, and grocery shopping. (*Id.*)

The record, however, provides additional context. Plaintiff testified that on a typical day, her husband made breakfast for their three children and helped get their two older children ready for school. (*Id.* at 55.) Plaintiff packed school lunches for her two older children but had help with that on rough mornings. (*Id.*) After driving the two older children to school, Plaintiff spent the day with her infant child who, far from being active, spent most of her time playing with toys on a mat on the floor, and napping at noon. (*Id.* 55–56.)

In the afternoon, Plaintiff picked up one child from school while the other rode a bus home. (*Id.* at 56.) In the evenings, her husband started dinner, retrieved laundry from downstairs, and helped ready the children for bed. (*Id.*) Plaintiff folded laundry in a seated position after her husband brought it to her. (*Id.*)

Plaintiff also testified that she required substantial assistance on really bad days. Her husband would stay home from work or her sister came to care for her children. (*Id.* at 57.) Plaintiff explained that her sister generally came once or twice a week, and more often when she had time off, and remained for the entire day. (*Id.* at 61.)

Accordingly, substantial evidence does not support the ALJ's reliance on Plaintiff's daily activities to discount her subjective symptoms. Although Plaintiff cared for her children and performed some household tasks, the record reflects that her husband performed many responsibilities, that Plaintiff completed tasks with assistance or from a seated position, and that Plaintiff's sister regularly cared for her children when her symptoms were severe. By failing to adequately acknowledge the significant assistance she received, the ALJ overstated the degree to which Plaintiff's activities undermined her allegations of disabling symptoms.

## V.     CONCLUSION

For these reasons, the Court **REVERSES** the Commissioner's non-disability determination and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of §405(g) for further proceedings consistent with this Opinion and Order.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE

13